**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ROBERT M. MILLER, *Plaintiff*, v. JELENA MCWILLIAMS, *Chairwoman, Federal Deposit Insurance Corporation, et al.*, *Defendants*. | Case No. 1:20-cv-0671<br>Hon. Liam O'Grady |

**MEMORANDUM OPINION & ORDER**

This matter comes before the Court on the Parties' cross motions for summary judgment.[1] *See* Dkts. 92, 98. For the following reasons, Defendants' motion (Dkt. 92) is **GRANTED**, and Plaintiff's motion (Dkt. 98) is **DENIED**.

## I. BACKGROUND

This is a *pro se* employment Action brought by Plaintiff Robert Miller against his employer, Defendant Federal Deposit Insurance Corporation ("FDIC"). Jelena McWilliams, Chairperson of the FDIC, is also named as a Defendant in her official capacity. Mr. Miller is white, male, fifty-four years old, disabled, Republican, and a repeat litigator of employment claims against the Defendants. In this matter, he asserts two operative causes of action.[2] His first cause of action alleges violations of Title VII and the Rehabilitation Act due to Defendants'

[1] Mr. Miller motions for summary judgment only on his first cause of action. *See* Dkt. 98. At times, he argues against himself. *See, e.g.*, Dkt. 121, at 2 ("Defendant's motion for summary judgment fails to satisfy the summary judgment standard because there are genuine disputes over material facts . . . ."); *id.* at 13 ("Genuine issues of material fact exist as to Plaintiff's discrimination claims.").

[2] A third cause of action was dismissed by stipulation of the Parties. *See* Dkt. 38.

failure to promote him based on his race, sex, disability, and age.[3] *See* Dkt. 14, at 18–20. This cause of action also asserts unlawful retaliation based on his prior protected Title VII activities. *See* Dkt. 121, at 13. Mr. Miller's second cause of action charges Defendants with violating 5 U.S.C. §§ 2301–2302 by chilling Republican "speech and opinions" in the workplace. *See* Dkt. 14, at 22–25.

## II. LEGAL STANDARD

Summary judgment will be granted where, viewing the facts in the light most favorable to the non-moving party, there remains no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Marlow v. Chesterfield Cty. Sch. Bd.*, 749 F. Supp. 2d 417, 426 (E.D. Va. 2010). A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists and that summary judgment should not be granted in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). As the Supreme Court has held, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

[3] The Court must begin with several observations concerning Mr. Miller's first cause of action.

First, neither of the statutes Mr. Miller cites in his motion for summary judgment allow for recovery based on age discrimination. *See* Dkt. 98, at 1 (discussing "Title VII, the Rehabilitation Act, and/or the Americans with Disabilities Act"); *see, e.g.*, *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 586 (2004) ("Congress chose not to include age within discrimination forbidden by Title VII[,] being aware that there were legitimate reasons as well as invidious ones for making employment decisions on age."); *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 465 n.4 (1982) (similar). Mr. Miller's failure to invoke any statutory bases for his requested relief for age discrimination casts doubt on the viability of his claim, notwithstanding his passing reference to the Age Discrimination in Employment Act in a single sentence in his operative pleading. *See* Dkt. 14, at 1, ¶ 1. Because the Court finds Mr. Miller's age discrimination claims meritless, it need not decide whether this deficiency independently warrants denying him relief.

Second, throughout his various filings, Mr. Miller argues that a "feminist cabal" comprised of "presumed lesbians" conspired against him because of his sex. *See, e.g.*, Dkt. 1, at 5, ¶ 26; *id.* at 8, ¶ 36; *id.* at 15, ¶ 85; Dkt. 99-2, at 44, ¶ 50; Dkt. 121-1, at 84. He also defines "Jews" as a race in support of similar arguments concerning his whiteness. *See* Dkt. 121-1, at 84. To the extent he has not abandoned these arguments, the Court will not consider them; they are inflammatory and incredible.

Third, the Court notes that Mr. Miller commenced the Equal Employment Opportunity administrative process in connection with this suit before he learned who was selected for the position for which he interviewed. *See* Dkt. 92-3, at 4. He subsequently developed his theories of sex, gender, and age discrimination after learning the selectee's identity. *See id.*

summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 477 U.S. at 247–48).

To determine whether summary judgment is appropriate in a discrimination case, the ultimate question of law is whether the evidence is sufficient to create a genuine issue of fact as to whether the employer discriminated against the plaintiff because of a protected characteristic. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–47 (2000).

## III. DISCUSSION

### A. Count I: Non-Selection Because of Age, Race, Sex, Disability, and Prior EEO Activities in Violation of 42 U.S.C. § 2000e-2 and 42 U.S.C. § 12203

#### i. Race Discrimination and Title VII Retaliation

Defendants generally concede *arguendo* that Mr. Miller "has met the burden of establishing a *prima facie* case" by a preponderance of the evidence with respect to his various claims in his first cause of action. *See* Dkt. 92-1, at 14; Dkt. 119, at 5 n.4. However, they note two exceptions.

First, they argue that Mr. Miller cannot make out a Title VII "failure to promote" claim based on race because the selectee the FDIC hired was also white. *See* Dkt. 123, at 5 n.2. The Court agrees. Because the selectee shared Mr. Miller's race, Mr. Miller was not "rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994); *see Sonpon v. Grafton Sch., Inc.*, 181 F. Supp. 2d 494, 500 (D. Md. 2002) (citing *Nichols v. Comcast Cablevision of Maryland*, 84 F. Supp. 2d 642, 650 (D. Md. 2000)) ("While the test does not explicitly state, as it does for discriminatory discharge, that the person hired must be outside of the protected class[,] courts have held that a plaintiff did not satisfy the fourth prong of the test for failure to promote where applicants of the same race

and gender as the plaintiff filled the positions for which he had applied.").[4] Mr. Miller otherwise identifies no factual evidence that would give rise to an inference of race discrimination. *See Carter*, 33 F.3d at 458. Dismissal of his race-based "failure to promote" claim is therefore proper.

Second, Defendants contend that Mr. Miller cannot make out a *prima facie* case of Title VII retaliation because he cannot demonstrate a "causal link" between his protected Equal Employment Opportunity ("EEO") activity and the adverse employment action he suffered. *See* Dkt. 119, at 8–9; *see Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005)). Again, the Court agrees.

The "causal link" requirement is not satisfied because the evidence indicates that none of the relevant decision makers had any knowledge of Mr. Miller's prior EEO activities. *See Randa v. Garland*, 2021 WL 1328543, at *2 (4th Cir. April 9, 2021) ("[W]e have clarified that the focus [in a Title VII retaliation claim] must be on whether the relevant decision makers were aware of an employee's protected activity."); *see* Dkt. 119, at 8 ("Ashley Mihalik, the selecting official, when asked by the independent investigator if she was aware of plaintiff being involved in EEOC activity prior to this complaint, answered 'no.' . . . A similar question was also asked of the other two panel interviewers, Vivek Khare and Krishna Patel, and they also answered 'no.'"); *see, e.g.*, Dkt. 92-3, at 66 (Mihalik Affidavit). "Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the *prima facie* case." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th

[4] *Miles v. Dell*, which considered quota-based racial "purges," is not to the contrary. *See* 429 F.3d 480, 488–89 (4th Cir. 2005).

Cir. 1998)). Here, prior knowledge is lacking.

Mr. Miller reasons that the relevant decision makers must have known of his prior protected activities because of his extensive history of litigating discrimination charges against the FDIC. Dkt. 99, at 17–18. His position is fundamentally speculative. *See id.* at 19–20; *see also* Dkt. 92-3, at 39 ("I also suspect that one or more of the [interviewers] may be acting as a 'cat's paw' for someone else's discriminatory and retaliatory motives . . . ."); *id.* at 55 ("I highly doubt that [my selecting official] has no knowledge of any prior EEO activity . . . .").

For example, he opines that because one of the relevant decision makers, Ms. Mihalik, was a *selectee* in an earlier interview process that gave rise to one of his prior discrimination complaints, she must have known of his prior EEO activity. *See* Dkt. 99, at 17. However, Ms. Mihalik was not the target of Mr. Miller's prior protected activities. She has testified repeatedly that she was unaware of them. *See* Dkt. 119, at 8; *see also* Dkt. 99-1, at 32.[5]

Mr. Miller also conjectures that Ms. Mihalik spoke with an individual, Ms. Olesiuk, that Mr. Miller named as a Defendant in several former discrimination complaints. *See* Dkt. 121, at 13; Dkt. 99, at 19–20 ("Mihalik was a cat's paw for Olesiuk's discrimination and retaliation."). He acknowledges that Ms. Olesiuk said nothing to Ms. Mihalik about him or his former EEO activities. *See* Dkt. 99, at 19–20. Still, he cries foul because Ms. Olesiuk "provide[d] an assessment" of the selectee, Kayla Shoemaker, to Ms. Mihalik. *Id.* at 19.

As an initial matter, "Ms. Mihalik did not discuss [the selectee] with Ms. Olesiuk other

[5] Along these same lines, Mr. Miller expresses frustration that Ms. Mihalik consulted with her direct supervisor, Bob Grohal, at the early stages of the selection process to "discuss some of the resumes she was considering . . . ." *See* Dkt. 92-3, at 57, ¶ 12. Mr. Miller points out that Mr. Grohal was "found guilty of discrimination and retaliation against [Mr. Miller] in a prior non-selection . . . ." *Id.* However, the record undercuts Mr. Miller's inference. Ms. Mihalik, after speaking with Mr. Grohal, chose to interview Mr. Miller out of a large pool of candidates. *See* Dkt. 99-2, at 75. Ms. Mihalik also testified that her conversation with Mr. Grohal did not "adversely affect[] Mr. Miller's selection." Dkt. 92-3, at 69, ¶ 35; *see also id.* ("There were candidates I wasn't sure if I wanted to interview who were eliminated based on my discussion with Mr. Grohal, but Mr. Miller was not eliminated.").

than to inform Ms. Olesiuk that [the selectee] was being considered for the position." *See* Dkt. 92-3, at 27. Regardless, even assuming Ms. Olesiuk did provide an assessment of the selectee, there would be no indication, one way or the other, of what she said. If she provided negative feedback about the selectee, Mr. Miller would have benefited from the alleged conduct he now bemoans.

All that aside, Mr. Miller's attempt to raise the specter of pretext falls short. Ms. Mihalik spoke with Ms. Olesiuk to gather information about candidates interviewing for the position. Dkt. 99-1, at 35 ("One of the interview panelists also suggested that I might consider speaking to Shayna Olesiuk, as Ms. Olesiuk had previous work experience with Mr. Miller. I spoke with Ms. Olesiuk based on this suggestion and also as a courtesy to let her know that I was considering Ms. Shoemaker, whom she supervised before Ms. Shoemaker was selected for the position in question."). This was Ms. Mihalik's standard practice. *See id.* at 41 ("Q: Did you also speak with former colleges [sic] for the other candidates? Ms. Mihalik: Yes. . . . [I] sought input from others who I thought might have work experience with the other candidates interviewed."). When Ms. Mihalik questioned Ms. Olesiuk about Mr. Miller, Ms. Olesiuk responded that she "preferred not to comment on her previous experience in working with Mr. Miller." *Id.* This response was patently reasonable; Ms. Olesiuk had already been sued several times by Mr. Miller for discrimination and risked further liability by speaking about him. *See* Dkt. 99, at 19–20. Ultimately, Ms. Mihalik testified that Ms. Olesiuk's non-response "neither positively nor adversely affected [Mr. Miller's candidacy] for the position." Dkt. 99-1, at 35.

Last, Mr. Miller advances a similar argument with respect to one of the other interview panelists, Ms. Patel. *See* Dkt. 102, at 9, ¶ 42 ("Patel was a responsible management official for an EEO complaint I filed in 2015 when I was not selected for a Senior Financial Economist

position. Patel was an interview panel member. After I filed that complaint, the Selecting Official Richard Brown offered me an additional position, and I withdrew my complaint."). Because the 2015 selecting official, Richard Brown, remedied Mr. Miller's complaint informally, there is no reason to think Ms. Patel was ever made aware of it, given her circumscribed role in the interview process. *See, e.g.*, Dkt. 99-1, at 33, ¶ 25 (outlining the role of interview panelists in the FDIC's selection process); *id.* at 48–54 (same). Mr. Miller tacitly acknowledges as much, describing the role of non-selecting panelists as "irrelevant." *See* Dkt. 121, at 8; *see also id.* at 19 (citing Dkt. 99-1, at 33) ("Mihalik testified in her affidavit that she was the management official responsible for not selecting Plaintiff, and that no other management officials were involved in that decision."). Though the Court disagrees with Mr. Miller on this point,[6] it observes that Mr. Miller cannot have his cake and eat it too. Either non-selecting panelists are irrelevant, or they can discriminate against him. Not both.

All this is a sideshow. Mr. Miller's theory about Ms. Patel's knowledge of his prior EEO activities is as conjectural as his theories about Ms. Mihalik's knowledge of his prior EEO activities. More is needed to make out a *prima facie* case of Title VII retaliation. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (citing *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) ("While a Title VII plaintiff may present direct or indirect evidence to support her claim of discrimination, unsupported speculation is insufficient.").

**ii. Discrimination based on age, sex, and disability**

As for Mr. Miller's "failure to promote" discrimination claims based on age, sex, and

[6] Common sense dictates that the panelists had a role in the post-interview deliberative process. *See* Dkt. 99-1, at 48 (Patel affidavit) ("There were three of us on the interview panel. . . . After the interview, we discussed the candidates and their responses."); *id.* at 60 (Khare Affidavit) ("I was an outside person and I assisted with vetting the candidate.").

disability, Defendants urge dismissal under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 575 (4th Cir. 2015) (applying the *McDonnell Douglas* framework to ADA disability discrimination claims); *Reyazuddin v. Montgomery Cty., Maryland*, 789 F.3d 407, 413 (4th Cir. 2015) ("Employment discrimination claims brought under [the Rehabilitation Act] are evaluated using the same standards as those applied under [the ADA].").

Under the *McDonnell Douglas* burden-shifting framework, once a Plaintiff establishes the elements of a *prima facie* case, the burden of production shifts to the Defendant employer to proffer evidence of a legitimate, nondiscriminatory reason for taking the adverse employment action. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the employer carries its burden of production, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered" were pretextual. *Id.* A "plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

Defendants have satisfied their burden of production. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993) (citing *Burdine*, 450 U.S. at 254) ("The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.") (cleaned up). Defendants offer multiple legitimate, nondiscriminatory reasons for hiring the selectee over Mr. Miller. *See* Dkt. 92-1, at 16–17. They explain, *inter alia*, that the selectee was well-qualified, had comparatively expansive experience, wielded highly relevant prior work experience, and possessed extensive familiarity

with policymaking on interagency rules. *See id.* Defendants also offer concrete examples (e.g., selectee's experience "presenting policy in international settings," "her work presentations to senior management up to the Chairman level," "her experience responding to Congressional requests," and "her high rating (V on a scale of I-V) on her most recent performance evaluation"). Dkt. 119, at 5–6. These examples overlay the duties of the CG-15 Senior Policy Analyst position. *See* Dkt. 92-1, at 4–6. As such, the Court finds that Defendants have proffered legitimate reasons for their hiring decision that are "reasonably clear and specific" in a manner that satisfies step two of the *McDonnell Douglas* burden-shifting framework.[7] *Burdine*, 450 U.S. at 258.

With Defendants having satisfied step two of the *McDonnell Douglas* framework, the burden shifts back to Mr. Miller to demonstrate by a preponderance of the evidence that the legitimate reasons proffered by Defendants for their actions were pretext for age, sex, and disability discrimination. *See Burdine*, 450 U.S. at 252–53; *Ballinger v. North Carolina Agr. Ext. Ser*, 815 F.2d 1001, 1005 (4th Cir. 1987). At this stage, the crucial inquiry is whether the employer acted based on an unlawfully discriminatory motive, "not the wisdom or folly of the employer's business judgments." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 383 (4th Cir. 1995); *see DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citing *Giannopoulos v. Brach*

---

[7] Mr. Miller urges the Court to impose a requirement that Defendants satisfy their burden of production by offering "comparative," rather than "declarative" statements. *See, e.g.*, Dkt. 99, at 22 ("[Some of Defendants' reasons for hiring the selectee] are *declarative* statements, not *comparative*. Mihalik does not assert that Plaintiff did not possess the experience she described for [the selectee]. Thus, as a matter of law, these proffered legitimate, nondiscriminatory reasons for her actions fail to satisfy the second part of the *McDonnell Douglas* burden shifting framework.") (emphasis in original). He cites no authority for this position, and the Court is aware of none.

Mr. Miller also asks the Court to impose on Defendants the obligation of setting forth in staggering detail the comparative statements that they have provided. *See id.* ("[Though some of Defendants' reasons for hiring the selectee] are appropriately comparative . . . they also fail because they are not clear and specific."). Of course, Defendants' proffered reasons for their decision need only be clear and specific to a reasonable degree. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981). The Court will not subject employers to an inquisition at step two that converts a burden of production into a burden of persuasion. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

*& Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)) (recognizing that courts must not "sit as a kind of super-personnel department weighing the prudence of employment decisions" by second-guessing whether a particular employment decision was "wise, fair, or even correct"); *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001) (citing *Kulumani v. Blue Cross Blue Shield Ass'n.*, 224 F.3d 681, 685 (7th Cir. 2000)) ("A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks."); *Bennett v. New Founds. Children & Family Servs., Inc.*, 2010 WL 517900, at *8 (D.S.C. Feb. 10, 2010) (recognizing that the pretext inquiry "does not convert Title VII into a vehicle for challenging unfair—but nondiscriminatory—employment decisions."). In other words, the employee "must present evidence reasonably calling into question the honesty of his employer's belief" of the bases for its personnel actions. *DeJarnette*, 133 F.3d at 299 (citing *Giannopoulos*, 109 F.3d at 411 (7th Cir. 1997)); *Sharif v. United Airlines, Inc.*, 2015 WL 4042173, at *6 (E.D. Va. July 1, 2015).

Mr. Miller labors to stave off summary judgment by separating and challenging the individual bases of Defendants' decision to hire the selectee. *See* Dkt. 121, at 14–20. However, his approach runs counter to employers' broad discretion to make holistic, nondiscriminatory hiring decisions. *See Hux v. City of Newport News, Va.*, 451 F.3d 311, 319 (4th Cir. 2006) ("[The Defendant] was entitled to focus on the applicants' qualifications taken as a whole—a judgment is not rendered pretextual by the fact that one among many factors is allegedly in dispute."); *id.* at 315 ("[Plaintiff] cannot simply compare [himself] to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination."); *see* Dkt. 119, at 7 ("Here, the FDIC's decision as to which candidate was most qualified was based on multiple factors: work experience in the Division of Research;

interview responses; the most recent performance ratings; and other relevant work experience."); Dkt. 92-3, at 27 ("[Defendants] considered [Mr. Miller's] previous performance as one of many factors.").

Mr. Miller concludes, based on his piecemeal analysis, that he is "plainly superior" to the selectee.[8] Dkt. 99, at 11. However, it is "the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *DeJarnette*, 133 F.3d at 299 (citing *Evans*, 80 F.3d at 960–61); *contra* Dkt. 92-3, at 43 (Miller Affidavit) ("I believe my [interview] responses were excellent."); *id.* at 59 ("I have substantially more education, experience, and skills than [the selectee] as stated in my prior Affidavit. The only distinctions between me and [the selectee] for which Mihalik claims [the selectee] was superior consist entirely of subjective judgments.").

Mr. Miller "cannot establish [his] own criteria for judging [his] qualifications for the promotion." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005). Rather, "based on the qualifications established by [Defendants]," *id.*, he must show that Defendants' reasons for hiring the selectee are "unworthy of credence." *See Dennis v. Columbia*

---

[8] Among other things, Mr. Miller:

- Complains that it was "impossible to discern how much policy experience [the selectee's] Financial Analyst job entailed," Dkt. 121, at 14;
- Boasts of his unique rulemaking experience, *id.* at 14–15;
- Takes issue with Defendants' crediting of the selectee's experience "presenting policy in international settings" because it is "declarative, not comparative, and thus fails to meet Defendant's *McDonnel Douglass* [sic] burden," *id.* at 15;
- Attacks Defendants' decision to credit the selectee's comparatively "greater and more in depth experience" as "too vague and conclusory," *id.*;
- Challenges the weight Defendants' afforded to the selectee's experience training other analysts because he, too, has "provided *guidance* to lower-graded staff," *id.* at 16 (emphasis added);
- Minimizes the selectee's "experience responding to Congressional requests," even though the vacancy outlined the role's responsibilities as encompassing personal contacts with Congressional staff, *id.* at 17;
- Argues that "no reasonable jury would conclude that [the selectee's] most recent performance evaluation was a decisive factor in [her] selection," because recent job performance evaluation is "immaterial," *id.* at 17; and
- Contends that his experience as a paralegal was improperly undervalued vis-à-vis the selectee's coursework in legal topics, *id.* at 18.

*Colleton Med. Ctr., Inc.*, 290 F.3d 639, 646 (4th Cir. 2002) (citing *Burdine*, 450 U.S. at 256).

This he cannot do:

- Mr. Miller and the selectee both had the requisite tenure for the position. Both worked in high-grade positions at the FDIC for a similar number of years prior to interviewing. *See, e.g.*, Dkt. 92-3, at 45–46. Any difference in the length of their experience was *de minimis*. *See* Dkt. 119, at 7 (citing *Philip v. Esper*, 2020 WL 3579796, at *15 (E.D. Va. June 30, 2020) (citing *Moore v. Mukasey*, 305 F. App'x 111, 116 (4th Cir. 2008))) ("[I]t is equally well-established that showing one's qualifications are 'similar or only slightly superior' is insufficient to establish pretext.").
- Defendants "found [the selectee] to be overall more qualified than [Mr. Miller] because she had more extensive policy-making experience including interagency experience," and because the selectee "had experience responding to Congressional requests which are a significant part of the job duties for the position." Dkt. 92-3, at 27.
- The vacancy posting specifically stated that "there is no substitution of education for the experience for this position." *See* Dkt. 92-1, at 18; Dkt. 92-3, at 96. Thus, Mr. Miller's self-avowed "clearly superior" educational credentials do not evidence pretext. *See McIntyre v. City of Chesapeake*, 2015 WL 2064007, at *8 (E.D. Va. Apr. 30, 2015); *see* Dkt. 92-3, at 27 ("[Ms. Mihalik] knew [Mr. Miller] had a Ph.D., and although [the selectee] does not have a Ph.D., her education focused on law and public policy. Ms. Mihalik found this education to be more relevant to the position.").
- The selecting official reasonably considered the candidates' "work autonomy" to determine that Mr. Miller was a worse fit for the role. *Compare* Dkt. 92-3, at 27 ("[Ms. Mihalik explained that Mr. Miller] works on the development of responses to legislative and regulatory proposals, but she noted he does so under close supervision."), *with* Dkt. 92-1, at 19 ("More important is that the selectee worked independently with staff and management and other FDIC units to identify and define appropriate topics of inquiry related to financial trends and their implications for the banking industry.").
- Defendants' focus on the implications of the candidates' interview responses, rather than interview performance itself, makes perfect sense. *See* Dkt. 99-2, at 76 ("Ms. Mihalik and Ms. Patel explain that interviews were not scored, and that the skills addressed during [the selectee's] interview indicated that she was the most qualified candidate for the position."); Dkt. 92-3, at 28 ("Ms. Patel believe[d] [the selectee's] answer to one question was weaker than [Mr. Miller's] answer. However, she believe[d] [the selectee's] answer demonstrated her skill set was stronger. Ms. Patel also noted [the selectee] used different examples, but [Mr. Miller] used the same example which showed a narrower range of skill."). The Court will not compel Defendants to give more credit to "interview performance" than to the information gleaned from interview responses.
- Defendants were entitled to consider the selectee's superior annual performance evaluation (PMR) and afford it due weight. *Contra* Dkt. 99, at 14 (Miller's motion for summary judgment) ("Selectee's most recent performance evaluation was a V (with V being the highest) and Plaintiff's more recent evaluation was a III, but Defendant's claim is a pretextual excuse. Standing alone, [the selectee's] superior performance evaluation could not lead to her selection in the face of all of Plaintiff's other plainly superior

qualifications."). Certainly, the selectee's most recent annual performance was not "immaterial" to Defendants' decision, as Mr. Miller suggests. *See* Dkt. 121, at 17.

Defendants outline many of these considerations, their selection process, and more in their sworn statements. *See, e.g.*, Dkt. 99-1, at 52–54; Dkt. 92-3, at 27. The Court has carefully reviewed these submissions and finds insufficient indicia of discrimination to warrant second-guessing Defendants' apparent good-faith efforts to assess the candidates. *See Hux*, 451 F.3d at 319; *Amirmokri v. Baltimore Gas & Electric Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995). What Mr. Miller views as evidence of his "plain superiority" can support just the opposite conclusion; that the selectee was plainly superior to Mr. Miller in the eyes of the decision maker. Title VII "is not a vehicle for substituting the judgment of a court for that of the employer." *Jiminez*, 57 F.3d at 377 (citing *EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992)).

In a last-ditch effort to demonstrate pretext, Mr. Miller points to other information that, in his view, lends credence to his allegations of discrimination. None of this information, considered in conjunction with all the record evidence, proves by a preponderance of the evidence that the legitimate reasons offered by the Defendants were not their true reasons, but instead were pretext for discrimination. *Burdine*, 450 U.S. at 253; *see Herring v. Thompson*, 2003 WL 23590541, at *6 (D. Md. May 12, 2003) (citing *Dennis*, 290 F.3d at 648 n.4) ("[A Plaintiff] can also prove pretext by demonstrating that the totality of circumstances establishes that the defendant's proffered reason, although factually supported, was not the actual reason relied on, but was rather a false description of its reasoning manufactured after the fact.") (cleaned up).

<u>For one</u>, Mr. Miller argues that the FDIC's self-declared mission to increase senior management diversity tainted his selection process. *See* Dkt. 99, at 18–19; *see also* Dkt. 121-1, at 76 ("The FDIC's Diversity and Inclusion Program is biased toward minorities, women, and

Democrats. . . . The Office of Minority and Women Inclusion programs celebrate the accomplishment and contributions of women, blacks, Asians, gays and lesbians, transgenders [sic], and disabled persons."). He relies on statistical evidence to support this argument, but his underlying data is stale. *See* Dkt. 99, at 18 ("From 2011 through 2013, women had a higher selection rate (24%) than men (21%) for grades CG-13 through CM-1 . . ."). The data he cites also indicates that "the overall number of selections slightly favored men," *id.* at 18 n.6, even though women were selected at a proportionately higher rate. *See id.*

Perhaps more fundamentally, Mr. Miller does not explain how the FDIC's institutional focus on diversity had any impact on his non-selection. *See generally id.* Mr. Miller certainly feels alienated. *See* Dkt. 102, at 8–9, ¶¶ 45–49 ("Sometime between March 2015 and 2019, the FDIC held a conference dedicated toward women. I received a notice of this conference by email through the FDIC's internal network. I did not attend this conference because, as a male, I did not perceive myself as being invited."). However, the record indicates that these feelings of alienation may stem from his open hostility toward his colleagues, rather than his purported marginalization as a white, disabled, male Republican in his mid-50s. *See, e.g.*, Dkt. 2, at 14 (Letter from Philip Shively, Deputy Director, Center for Financial Research to Robert Miller re: Placement on Paid Leave) ("Dear Robert . . . I want to warn you that some of your recent communications have been unacceptably inflammatory and disrespectful (e.g., telling FDIC officials they will be sent to a 'federal pound-you-in-the-ass penitentiary') and have been perceived as expressing unacceptable discriminatory animus (e.g., your request that you only be examined by a 'white, male, Christian, heterosexual, Republican' doctor)."). The Court will not presume individualized discrimination just because an employer strives for institutional diversity in leadership ranks. The Court also will not ignore the alternative bases for Mr. Miller's

estrangement from his workplace community.

Second, Mr. Miller argues that prior discrimination against him by others within the FDIC indicates that Ms. Mihalik discriminated against him in this instance. Dkt. 99, at 17. This is a propensity argument that cannot be reconciled with his litigating position that only the conduct and opinions of the selecting official are relevant. *See* Dkt. 121, at 19. In any case, his position is built on a faulty premise: the more he sues the FDIC for discrimination, the more the FDIC will discriminate against him.

Third, Mr. Miller contends that Ms. Mihalik's reasons for choosing the selectee are likely to evolve over time, thereby elucidating pretext. *See* Dkt. 99, at 23 (citing *Loveless v. John's Ford*, 232 F. App'x 229, 236 (4th Cir. 2007)) ("If Defendant were to provide more clarity and specificity at trial than she did at the time of the nonselection, this would be strong evidence of pretext."). He concedes that Ms. Mihalik's explanations have not yet wavered. *See id.* Still, he insists that they will; that she will perjure herself at trial. *See id.* Summy judgment will not be denied on a mere conjecture.

Similarly, Mr. Miller complains that Defendants' attorneys have separately introduced "a new, undisclosed, proffered reason for [Defendants'] actions" because they argue that the duties and responsibilities of the Senior Policy Analyst position were more in line with the selectee's prior work responsibilities. Dkt. 121, at 20 (citing Dkt. 92-1, at 20). Mr. Miller is correct to observe that an employer's "inconsistent, conflicting, or contradictory explanations may be evidence of pretext." *Id.* at 12 (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). However, no conflicting or contradictory explanation is present here. Defendants' attorneys are simply outlining the selectee's fit for the role, which was always a basis for her selection. *Compare* Dkt. 92-3, at 29 ("[Defendants believe Mr. Miller] was not

selected for the position because the three top candidates demonstrated they were a better fit based on their responses and their experiences."), *and id.* at 61, ¶ 27 (similar), *with* Dkt. 92-1, at 20 ("It is evident from the position description for the Senior Policy Analyst that the duties and responsibilities were more in line with the duties and responsibilities of an Analyst and therefore, more in line the [sic] duties of the selectee rather than the Plaintiff's.").

* * *

Mr. Miller cannot prove by a preponderance of the evidence that the legitimate reasons offered by Defendants for not hiring him were a pretext for discrimination based on his age, sex, and disability. *See, e.g.*, *Causey v. Balog,* 162 F.3d 795, 801 (4th Cir. 1998). Because he fails to satisfy step three of the *McDonnell Douglas* burden-shifting framework, his first cause of action must be dismissed.

**B. Count III: Discrimination and Hostile Work Environment Because of Political Affiliation in Violation of 5 U.S.C. §§ 2301 and 2302**

**i. Administrative Remedies**

The Court lacks jurisdiction to adjudicate Mr. Miller's claim for "Discrimination and Hostile Work Environment Because of Political Affiliation in Violation of 5 U.S.C. § 2301 and § 2302." Dkt. 14, at 22. He has no private cause of action under these statutory provisions in the Eastern District of Virginia. *See Fleming v. Spencer*, 718 F. App'x 185, 186 (4th Cir. 2018).

Mr. Miller alleges that the FDIC discriminated against him based on his political leanings in violation of Sections 2301 and 2302 of Title 5. *See* Dkt. 121, at 22–30; *see also* Dkt. 14, at 14–18, ¶¶ 96–127. But, insofar as Mr. Miller even suffered an actionable "prohibited personnel practice," his remedies are circumscribed by the Civil Service Reform Act ("CSRA"). He must file a complaint in the Office of Special Counsel ("OSC"). *See Hecht v. Hargan*, 2019 WL 498819, at *2 (D. Md. Feb. 8, 2019) (citing *Fleming*, 718 F. App'x at 186–88; 5 U.S.C.

§ 1214(a)(3); *id.* § 2301(b)(2)) ("For allegations of prohibited personnel practices that are not considered 'adverse actions' under the CSRA, the statute requires complaints be first brought to the Merit Systems Protection Board's ("MSPB") Office of Special Counsel. These prohibited practices include the taking of any personnel action that violates 'merit system principles,' including any violation of an employee's constitutional rights and any 'arbitrary action.'") (internal citations omitted). After receiving a complaint, OSC assesses whether there exist reasonable grounds to believe a violation of the CSRA has occurred. *See, e.g.*, 5 U.S.C. § 1214(a)(1)(A), (b)(2)(A). If OSC does not pursue the complaint, the CSRA provides no further administrative or judicial review. *See Fleming*, 718 F. App'x at 186–87. However, if OSC does identify reason to believe that a violation has occurred, it communicates its findings to the MSPB and the employing agency. 5 U.S.C. § 1214(b)(2)(B). If the agency fails to take corrective action, OSC may petition the MSPB for a remedial order. *Fleming*, 718 F. App'x at 186–87 (citing 5 U.S.C. § 1214(b)(2)(C)). If no order issues, an aggrieved federal employee may seek judicial review only in the Federal Circuit. 5 U.S.C. § 1214(c); *id.* § 7703(b); *Fleming*, 718 F. App'x at 188.

These procedures represent the entirety of the legal redress available to Mr. Miller under 5 U.S.C. §§ 2301 and 2302; they exist "to the exclusion of all other statutory remedies for claims arising out of the federal employment relationship." *See Hall v. Clinton*, 235 F.3d 202, 206 (4th Cir. 2000); *see also Schrachta v. Curtis*, 752 F.2d 1257, 1259–60 (7th Cir. 1985); *Veit v. Heckler*, 746 F.2d 508, 510–12 (9th Cir. 1984). No alternative implied private right of action is derivative of 5 U.S.C. § 2301 and 5 U.S.C. § 2302. *See Hubbard v. EPA*, 809 F.2d 1, 5 (D.C. Cir. 1986) ("[The] CSRA deprives the district court of jurisdiction to consider prohibited personnel practices; more serious infractions are appealable to the Merit Systems Protection

Board, with further review in the Courts of Appeal."); *see also Schrachta*, 752 F.2d at 1259–60; *Barnhart v. Devine*, 771 F.2d 1515, 1527 (D.C. Cir. 1985); *Carducci v. Regan*, 714 F.2d 171, 174–75 (D.C. Cir. 1983); *Broadway v. Block*, 694 F.2d 979, 984 (5th Cir. 1982); *Watson v. United States Dept. of Housing and Urban Development*, 576 F. Supp. 580, 585 n.5 (N.D. Ill. 1983); *Favors v. Ruckelshaus*, 569 F. Supp. 363, 369 (N.D. Ga. 1983). As such, no challenge may be raised under the Administrative Procedures Act, 5 U.S.C. § 702 *et seq*. *See, e.g.*, *Blue v. Widnall*, 162 F.3d 541, 544–45 (9th Cir. 1998) (citing *Veit*, 746 F.2d at 508) ("Federal courts have no power to review federal personnel decisions and procedures unless such review is expressly authorized by Congress in the CSRA or elsewhere. Accordingly, the district court had no jurisdiction under the APA to review the personnel actions challenged by [the Plaintiff.]") (internal citations omitted).

Mr. Miller did not file a complaint with the OSC in response to the political discrimination he allegedly suffered in this case. Even if he had filed such a complaint, judicial review would not be available in this Court. *See Fleming*, 718 F. App'x at 188.

**ii. Government Corporation Exception**

Even supposing this Court had jurisdiction to resolve Mr. Miller's third cause of action, Sections 2301 and 2302 would nonetheless exempt the FDIC, a government corporation, from these provisions' strictures. *See* 5 U.S.C. §§ 2301(c)(1), 2302(a)(2)(C)(i). Mr. Miller resists this outcome, citing Defendant Jelena McWilliams's Senate Testimony which indicates that the FDIC aspires to the Merit System Principles. Dkt. 121, at 22. ("Although the Federal Deposit Insurance Corporation, like other government corporations, is not covered by the statutorily prohibited personnel practices described in 5 U.S.C. 2302, the FDIC is subject to the merit systems principles described in 5 U.S.C. 2301 and other antidiscrimination statutes."). These

statements, without more, do not give rise to a judicially cognizable private cause of action against Defendants. The FDIC is a government corporation; the plain text of Section 2302 exempts government corporations from agency liability under Sections 2301 and 2302 in the absence of a regulatory implementation to the contrary. All authorities identified by this Court support this outcome. *Cf. Booker v. Merit Sys. Prot. Bd.*, 982 F.2d 517, 519 (Fed. Cir. 1992); *Dumaguit v. Potter*, 2008 WL 413733, at *15 (N.D. Cal. Feb. 13, 2008); *Hanft v. United States*, 2005 WL 1863321, at *5 (D. Idaho Aug. 4, 2005).

Accordingly, Mr. Miller's third cause of action must be dismissed.

## IV. CONCLUSION

For the reasons stated above and for good cause shown, Defendants' motion for summary judgment (Dkt. 92) is **GRANTED**, and Plaintiff's partial motion for summary judgment (Dkt. 98) is **DENIED**. Judgment will enter by separate order.

It is **SO ORDERED**.

July 28, 2021
Alexandria, Virginia

Liam O'Grady
United States District Judge